**Opinion issued September 26, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-14-00322-CV

————————————

## IN RE A.M.B., S.M.B., A.M.B., F.M.B A/K/A F.B.,

## S.M.B. A/K/A S.M., AND M.M.B., CHILDREN

———

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2013-01651J**

———

**MEMORANDUM OPINION**

B.B. and H.I., a father and mother, appeal the trial court's termination of their parental rights to their children. Each contends that the evidence is legally and factually insufficient to support the findings that they engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM.

CODE ANN. § 161.001(1)(E) (West 2014). They further contend that the evidence is legally and factually insufficient to support the finding that either parent allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being. *See id.* § 161.001(1)(D). Finally, they contend that the evidence does not support the trial court's finding that termination of their parental rights is in the children's best interest. We hold that legally and factually sufficient evidence supports the trial court's findings; we therefore affirm the terminations.

## Background

In early March 2013, the parents had five children under six years of age, and the mother was in late pregnancy of a sixth child. Eleven-month-old H.B. was their youngest child. H.B. could crawl and pull herself up by holding onto furniture, but she could not yet walk independently. One day, the mother noticed that H.B. was having difficulty breathing before putting her down for a nap. When the mother returned an hour and forty minutes later, she discovered that H.B. was not breathing. She woke the father and brought him to H.B. The father told the mother that H.B. was dead. The mother called 911.

Patrol officers from the Houston Police Department arrived at the family home in response to the call. The mother led them to the bedroom, where officers found H.B.'s body. The right side of the baby's torso, her right thigh, and her right

forearm had several large burned areas; someone had covered the areas with a pasty whitish substance. The burns were so bad that the deeper layers of flesh were exposed.

The burns occurred four days before H.B.'s death. Through an interpreter,[1] the parents initially told police that the mother had been away using the bathroom when one of the other children pulled a pot of boiling water from the range and spilled it onto the H.B., who was crawling in the kitchen. In a later version of the story, the baby was crawling and bumped into the range, causing the pot of boiling water to fall from the stove and splash onto the baby. The baby's injuries were not consistent with the latter explanation. The police questioned one of the older children; her answers also were inconsistent with the baby's injuries.

The officers further questioned the mother, and she again changed her story, explaining that one of the other children had ignited a paper napkin within the open oven and set the baby's clothing on fire. Neither HPD nor CPS found the proffered explanations plausible.

The father insisted that he was not home when H.B. was burned. He told investigators that the mother told him about the incident over the telephone. According to the father, the mother said that when she returned from the bathroom, H.B.'s clothes were on fire. When the father arrived at home, he was surprised to

---

[1] The parents are from Somalia and speak little English.

3

see such a large burn on H.B. He asked the mother how H.B.'s clothes caught on fire, but she only cried and did not give him an explanation.

The father bought cocoa butter lotion to treat the burns. A family friend provided acetaminophen capsules to the father. The mother mixed an unspecified amount of powdered acetaminophen into the cocoa butter lotion and applied the mixture to the burns. The father stated that he did not know that the mother put acetaminophen in the lotion. A bowl containing the lotion-acetaminophen mixture was found in the baby's room. The officers also found 50 or 60 empty gel capsules, a large, half-empty bottle of 500-milligram acetaminophen capsules, and an opened bottle of over-the-counter cough syrup. The parents denied giving the baby the cough syrup.

Before H.B.'s injury, the parents had taken their children to the doctor for other ailments and checkups. The parents had taken H.B. to the doctor a few months earlier for breathing problems and a cough. But, the parents explained, they did not seek medical treatment for H.B.'s burns because their knowledge of medicine was "wasn't that good" and they were fearful of what might happen if medical personnel knew that the child had been burned. The mother testified that she feared that the child who lit the paper napkin on fire would be in trouble, and she was afraid if the authorities learned about the incident, her children would be taken away.

4

Dr. P. Gumpeni, an Assistant Deputy Chief Medical Examiner for Harris County, provided expert testimony concerning the baby's autopsy, and the trial court admitted photographs of the child demonstrating the severity of the burns. The baby's blood showed an extremely high level of acetaminophen. The blood also contained bromphenaramine, dextromethorphan, and dextrorphan, the active ingredients in the over-the-counter cough syrup. The autopsy revealed that the cause of the baby's death was acute acetaminophen toxicity with liver failure following unexplained scald burns. In his opinion, the failure to seek medical attention for the baby constituted medical neglect. The death was ruled a homicide.[2]

According to his testimony, the baby had second- to third-degree burns covering about 15 percent of her body. Dr. Gumpeni further testified that the baby had bronchial pneumonia, consistent with an acute infection and most likely the result of the burns. In Dr. Gumpeni's opinion, a reasonable person would have promptly obtained medical treatment for a child with these severe burns. The doctor further opined that, if the baby had received medical treatment for the burns, then she would not have died.

The Child Protective Services' investigator testified that the parents' home appeared clean and well cared-for. The surviving children appeared clean and

_____

[2] The mother is currently under felony indictment alleging injury to a child.

well-fed, but the investigator testified that they were withdrawn and uncommunicative. The two oldest children refused to be interviewed by the HPD detectives, the CPS investigator, or the interviewer at the Children's Assessment Center. The children's older cousin told the CPS investigator that the children rarely speak with him either.

CPS took the surviving children into custody and placed them with their maternal grandparents. After the mother gave birth to M.B. in April 2013, CPS also took her into custody and placed her in foster care. By the time of the trial, CPS had identified a friend of the family who was willing and able to care for her, and the trial court ordered her to be placed with the friend.

The mother testified at the termination trial that H.B. sustained the burns when her young brother lit a napkin from within an open oven, and he caught his sister's clothes on fire. She admitted that that she told inconsistent stories about what happened to protect the other child and avoid termination of her parental rights.

## Discussion

### I. Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982);

6

*accord In re E.R.*, 385 S.W.3d 552, 563 (Tex. 2012) (quoting *Santosky*). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute," and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003) (internal quotation omitted). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights under section 161.001, the Department must prove, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions, justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344. "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination

7

is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362.  Thus, if the trial court's judgment relies on multiple predicate grounds, we may affirm on any one of those grounds.  *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental-rights-termination case under section 161.001, we look at all the evidence to determine whether the evidence, viewed in the light most favorable to the finding, is such that the factfinder could reasonably have formed a firm belief or conviction about the truth of the issues on which the Department bore the burden of proof.  *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).  We defer to the trial court as fact-finder and resolve disputed facts in favor of its finding if a reasonable factfinder could do so.  *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266; *Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Termination findings withstand a factual sufficiency challenge if the evidence is such that a reasonable factfinder could form a firm belief or conviction that the statutory grounds for termination exist. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002).  To reverse a case on factual insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and

8

clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 19.

## II.    Evidentiary sufficiency

In their separate appeals, the mother and the father contend that the evidence is legally and factually insufficient to support termination of their parental rights under Texas Family Code sections 161.001(1)(D) and (E).    Each of these provisions provides a basis for terminating parental rights because of child endangerment.    "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan*, 325 S.W.3d at 723; *In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)).    A child is endangered when the environment creates a potential for danger that the parent disregards. *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

"Although 'endanger' means more than a threat of injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see also In re J.O.A.*, 283 S.W.3d at 345 (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be

established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining that relevant conduct may occur either before or after child's removal from home).

While both subsections D and E focus on endangerment, they differ regarding its source and proof. Subsection 161.001(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D). This provision focuses on the child's living environment, rather than the parent's conduct. *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.); *see In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Parental conduct nevertheless remains relevant because it may produce an endangering environment. *See Jordan*, 325 S.W.3d at 721.

Subsection 161.001(1)(E) provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the

10

child." TEX. FAM. CODE ANN. § 161.001(1)(E). The parent's conduct must cause the endangerment, and the endangerment must be the result of a voluntary, deliberate, and conscious course of conduct by the parent rather than a single act or omission. *Jordan*, 325 S.W.3d at 723; *In re J.T.G.*, 121 S.W.3d at 125.

The relevant inquiry is whether evidence exists that the parent's conduct—including acts, omissions, and failures to act, both before and after the birth of the child—directly endangered the child's physical well-being. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied); *see Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1997); *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Parental conduct may be relevant even if it does not involve the child or result in actual harm to the child. *In re D.M.*, 58 S.W.3d at 811; *see also Jordan*, 325 S.W.3d at 723 ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being.").

The Department presented evidence that the parents were neglectful in failing to seek health care for H.B. over the course of four days, and administered a lethal dose of acetaminophen, contrary to its indicated use. The evidence shows that both the mother and the father knew the baby had suffered serious burns at or near the time they occurred, and the photographs depict grave injuries. Neither parent sought professional medical attention for the baby over the course of the

11

four days between the injury and the baby's death, even though the child experienced extreme pain during that time. The reason the parents gave for not taking the baby for medical treatment had to do with their fear of government involvement, not because of any mistaken belief concerning the baby's condition.

Instead of taking the baby for medical treatment, the father obtained over-the-counter medication, which the mother applied to the burns. The decision to add acetaminophen to the cocoa butter lotion after having applied the cocoa butter lotion alone shows an awareness that the baby was in pain and needed more serious medication, as does the administration of cough syrup. The father denied having tried to treat the baby with these medications, and the mother denied giving the baby cough syrup. In the presence of evidence to the contrary, their denials show a consciousness that the baby was not improving in their care and that she needed professional medical attention in the days before her death.

"[T]he manner in which a parent treats other children in the family can be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child." *Cervantes-Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.). Viewing all of this evidence in a light most favorable to the trial court's findings, we hold that a reasonable factfinder could form a firm belief or conviction that the parents (1) knowingly placed or

knowingly allowed their children to remain in conditions or surroundings which endangered their physical or emotional well-being and (2) engaged in conduct or knowingly placed their children with persons who engaged in conduct that endangered J.L.'s physical or emotional well-being. TEX. FAM. CODE ANN. § 161.001(1)(D), (E); *see In re J.L.*, 163 S.W.3d 79, 87 (Tex. 2005)

In contending that the evidence is factually insufficient to support the termination of their parental rights, the parents point to Dr. Gumpeni's testimony that it may have been possible for the baby to eat and walk after experiencing these burns, which a lay person might perceive as a sign that the child is improving. They also cite argument of counsel on the issue. No evidence in the record, however, indicates that the parents observed H.B. walking or eating solid food after she suffered the burns, and while it may be possible that an 11-month-old with severe burns could nonetheless move, the photographs reveal that any movement would necessarily cause severe pain. *See Dunn v. Dunn*, 177 S.W.3d 393, 398 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (disregarding counsel's representation based on rule that arguments of counsel are not evidence). Counsel's statements are not evidence that would undermine the trial court's firm belief or conviction supporting its endangerment findings.

## A. Children's best interest

A strong presumption exists that a child's best interest is served by maintaining the parent–child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interest of the child. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent–child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

## 1. The children's desires, physical and emotional needs, and the emotional and physical danger to the children, now and in the future.

The children are too young to state their desires. The CPS worker testified that, when he met the five older children, they were withdrawn and did not speak, even to their cousin. While they were clean and adequately nourished, they appeared to have suffered from neglect. Since moving to live with their grandparents, the children are much less withdrawn and appear happy and healthy. Their schools and family members noticed a significant improvement in the children's demeanor and behavior. The grandparents wish to adopt the children and are committed to their care for the long term.

At the time of trial, M.B., born after the incident, was eleven months old and in foster care. The Department did not place this child with the grandparents because they did not have the resources to care for the baby in addition to the five older children. The Department reported that the baby was meeting her milestones and doing well in foster care. The Department identified a family friend willing and ready to care for her and raise the baby as her own, and the trial court has approved the proposed placement.

## 2. Parental ability and programs available to assist in promoting the children's best interests.

The mother has completed a parenting course, and she testified that she would not hesitate to obtain medical care for a child in the future. The father did not testify. At the time of the criminal investigation, the father denied knowing that the mother mixed the acetaminophen into the cocoa butter and applied it to H.B.'s wounds, but the evidence of the surrounding circumstances supports a contrary inference. The Department attributed the children's neglect to both the mother and the father because both were present in the home. This factor does not undermine the trial court's finding that termination is in the children's best interest.

## 3. Stability of the home or proposed placement.

The evidence showed that the five older children are well-adjusted to their placement with their grandparents. The grandparents are committed to caring for the children on the long term. They nurture the children's connection with their culture and their religion, and the children remain part of the close-knit Somali community. The CPS caseworker testified that the grandparents intend to adopt the children and are appropriate and capable of providing the children with a safe, secure, protective, and nurturing environment which will meet the children's short- and long-term needs. As managing conservator, CPS will continue to assist the grandparents with the children's care as they become more familiar with the children's healthcare providers and schools.

16

The baby, M.B., will be placed another member of the Somali community who is also a family friend. That person stated she will raise the baby as her own. M.B. will have the opportunity to interact with her siblings and grandparents while getting the nurturing she needs. This *Holley* factor weighs in favor of the trial court's best-interest determination.

### 4. The acts or omissions of the parents and any excuse for such acts or omissions.

The trial court considered that an incident like the one that resulted in H.B.'s death was not likely to recur. But the mother gave inconsistent explanations for H.B.'s burns. The medical examiner testified that a reasonable person would have sought immediate medical attention for such severe burns. The parents' explanation for not seeking medical attention disregarded the seriousness of H.B.'s condition and did not take her welfare into account. The parents proffered no excuse for administering H.B. a lethal dose of acetaminophen, contrary to its indicated use. A criminal prosecution is ongoing. This *Holley* factor supports termination of parental rights.

## Conclusion

Based on the evidence adduced at the termination hearing, the trial court reasonably could have formed a firm conviction that the parents' conduct had endangered their children and termination of the parents' rights was in the children's best interest. We therefore affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Justices Higley, Bland, and Sharp.